Okay, we'll hear Council and Nationwide Life Insurance v. Commonwealth Land Title Insurance. I have preserved 8 minutes of my time. 8 minutes? That's a long amount of time. Okay, that's all right. You can do whatever you want. You're free. Well, as you'll see, the reason is based on my argument. Okay. The issue before your honors today... Well, we'll wait and see. That is his office. Exactly. Okay. The issue before your honors today is relatively straightforward. What's the correct reading of a provision of an endorsement to an insurance policy? Yes. In this case, it's a title, it's a land title insurance policy. And Commonwealth, joined by the title industry and EC, urged this court to read the provision in the context of the entire endorsement as part of the total insurance policy in the manner consistent with the 100% uniform customary usage in the title industry. Before we go back to the chase, how do you explain the presence of the words any instrument in paragraph 1B10? Doesn't your proposed interpretation render those words superfluous? Not really, your honor. Let me explain why. The problem with the approach of the district court in Nationwide is that it takes one word in a multi-hundred page endorsement, which is part of the multi-thousand word policy, and places inordinate emphasis on that word out of context. What the endorsement says to answer this particular question, which is not the emphasis on the word, it's that your reading eliminates the word. It disappears. That is what the district court said. Explain why that's an incorrect understanding. Because our reading focuses on the language of the endorsement that provides, that was placed back into coverage. It's that aspect of the instrument that isn't expressly accepted on Schedule B. That doesn't seem to me to answer the question about what the word instrument means. Let me ask this. Can you give us any kind of update on what's happened with the proposed modified endorsement of the ALTA endorsement 9.4? Yeah, absolutely. I actually have copies of the revised endorsement that was actually issued in June. So it has been issued. It is now formally the ALTA document. Okay. If that's the case, and in your briefing sometimes you call it a clarification, in another place you call it a significant revision. I mean, it's fair to say, isn't it, that it takes that word instrument out, right? It certainly makes the intention of the endorsement clearer, but the only way to reach the contention, the interpretation applied by the district court would be to ignore absolutely uniform industry usage of the provision, and ignore the provision of the endorsement that says that unless it's expressly accepted, there's coverage. And the instrument itself was, in fact, expressly accepted for coverage. So, with all due respect, by focusing on the instrument as what is placed back into coverage, that, in fact, ignores the endorsement language. It renders the schedule the exception, exclusion from coverage for the endorsement, for the instrument. How does this help you? I want to read to you from your brief, page 28. By deleting altogether any reference to, quote, instrument, unquote, the proposed ALTA 9.4, now the effective 9.4 for going forward purposes, I guess, makes clear what Commonwealth has argued all along, the only loss for damage sustained by one being in ready encumbrance is entitled to coverage, whether that loss of cause in encumbrance is not specifically identified in Schedule B. So, I read that, and I wonder to myself, how does this help you? If, in light of the district court's decision and the reading that instrument means, has some meaning, they go forward and they take the word instrument out to get it to say what you want it to say now, how does pointing to a change, and it says like a subsequent remedial measure, most people don't want that stuff, why are you putting it forward and saying, look, this proves we were right all along and not, look, this proves we were wrong and we fixed it? Because the website link that we provided in our brief makes it perfectly clear from the American Indian Title Association in proposing the modification that it was not a change in coverage. It was done specifically to eliminate the possibility of anybody else reading it the way the district court read it. For the first time, this is an endorsement that's been appended, according to the Amnesty brief, to millions of policies. Has it ever come to court before? There is no case in the nation urging the reading of the district court applied. Is there any case in the nation urging a different one? There isn't, but the flip side of the coin doesn't apply, because you don't look for cases that state the obvious. If it's so obvious, then I don't think we'd be here, so that's not going to advance the ball very much. The question is, this really is a matter of first impression, right? Absolutely. Is it also a matter of only impression? Because since you've changed it, are we only running for this case, I guess? No, Your Honor. Title insurance policies are not like other liability or general comprehensive liability or indemnity policies. The title insurance policy takes a picture of title at the time the policy is shown, and then going forward, ensures the status of title at that time. There are millions of policies, according to the Amnesty brief, with this endorsement. And the reality is the reason there are no cases is because no one has ever urged this reading. And as the Amnesty demonstrates, with Commonwealth participation representing more than 90% of the national title insurance market, no one has ever urged this reading before, and it has, in fact, never been applied. So your amendment only applies to newly written policies. New policies moving forward on the issuance of the endorsement. Once again, as expressed in this case. So that wouldn't be this case, then? In other words, if you are... I'm sorry. No, if you're saying it applies only to that which is written from now going forward, that excludes this particular case. Absolutely, and the millions of policies out there using the old language, which is why in regards to common court recognition of the Amnesty's position, which are the members of the American Asylum Association and the ALSA site itself, which stated that the change was done only to rebut the district court's misinterpretation of the endorsement. You know, you asked for a large portion of your time to be forward, so I'm afraid the red light is on because that's what happens. And we'll have more time in rebuttal to address the concerns of your audience. Yes, thank you. Good afternoon, Your Honors. May it please the Court, Paul Scherwitzel of the law firm Larsen & Scherwitzel for the Appley Nationwide Life Insurance Company. I believe that the brief we filed in this case is fairly complete, and I just want to add a couple of things. Didn't you each take a different position before, and haven't each of you reversed your position now? No, Your Honor, I have never taken a position. No, I really strike that. There is one poorly worded phrase in the supplemental brief I filed in the last case that was up here this quarter, before the last panel. Other than that, I have consistently and always taken the position that in order to accept the coverage that is applied to an instrument, one must affirmatively list the restrictions and other rights that are identified in 11X1 through 4 in paragraph 1B2. You stated before that Alta 9 does not provide or exclude coverage for documents. I misspoke, Your Honor. That is in the supplemental brief that I filed before the last panel. I was in a hurry, and I frankly misspoke. All of my other statements are to the contrary, Your Honor. And I point that out in my brief, Your Honor. I mentioned that I cannot reach for it, but I freely acknowledge that. Otherwise, my position has been consistent for the last 10 years. Let's go right to the point that was raised by your opposing counsel, which is that this is a position that is contrary to every understanding in this business, that no one has ever had the temerity to suggest the sort of thing that you are suggesting here. And you seem to accept that industry custom and practice could alter the meaning, not just of terms of art, but of the overall language of a provision, not as in Sundean, where we're looking at sudden and words like that, but the meaning of whole phrases and clauses. Is that your position? No, Your Honor, I do not accept that. The Sundean case, as I'm sure Your Honor is aware, refers to words and terms that are provided with a specialized meaning if you can come up with industry custom and usage. There's a reference in one of your presidential opinions, one of the Third Circuit's presidential opinions, the Aston Johnson case, that says maybe in the presence of universal evidence of contrary custom and usage, you might be able to hold an otherwise unambiguous provision contrary to its plain meaning. But that's not what we have here. Well, that's what your answer says, right? That's what uniform custom means. But there is no evidence of uniform custom. What about the testimony of the expert? The expert never testifies that the alchemy does not cover instruments. In fact, if you look at his book, he specifically says that the alchemy, quote, protects against the existence of certain instruments. So I don't think his expert is quite as clear as he would have this court believe. And moreover, there is no evidence, and I want to stress this, there is no evidence presently before this court in the record about industry custom and usage that is contrary to the plain meaning of these provisions. How about the evidence that they present, at least in form of argument, that this couldn't mean what you're saying it means, because their example is mowing the grass. Because they didn't want to mow the grass, suddenly you're off the hook. Or you could come up with any number of, you know, assume the Declaration of Restriction said that the buyer had to pay for advertising at Citizens Bank Park. That gets you off the hook? Anything at all gets you off the hook? No, Your Honor. The reason that the Altenheim has never been litigated before is because it essentially takes a black swan event to bring the Altenheim to play. I'm sorry. I know the ballet, but I don't know of a black swan event. But it's an event that is highly unlikely, Your Honor, contrary to what would normally be the case. You need to have a commercial lender that has a long-due battery and have the inability to remove its property in order to liquidate its collateral and collect on its own. That is a highly unlikely set of circumstances. But to answer your question, Your Honor, no. I believe that the Altenheim provides for damages caused by any instrument that has these provisions. In the event that they miss a provision, that's their problem. They are the experts. This is what they sell. They are title insurers, and that is what they bring to the table. But the upshot is that their hypothetical works. You get off the hook for that, right? I don't get off the hook. You get off the hook in the sense that even though perhaps nobody expected that a refusal by a potential buyer to want to mow the grass would end up being a coverage-implying event, you get coverage. In the real world, that's not going to happen. In the real world or not, I want you to stick with their hypothetical. Does their hypothetical not drive the result they say it does? No. Why not? Because Section 7 in the jacket of the policy says that damages are limited by the difference between what the property would be worth with the restriction and without the restriction. So in other words, if there's some small problem with the property, it is likely that the property will nonetheless be sold and that the lender will be able to recoup his losses. The rights and obligations in Roman at 1 through 4 of the Altamonte 1B2 are the four horsemen of the commercial owners' apocalypse. If the property doesn't sell, it doesn't sell, right? Their hypothetical is structured to say what happened to you happens, but it doesn't happen because people won't allow a non-pharmacy use. It happens for some more trivial sounding reason, but it still doesn't sell. So that's how I understand them to be driving their assertion that nobody would have understood this provision the way you're suggesting it is. Why are they wrong when they say that? Because the plain meaning of the Altamonte 1B says damages caused by any instrument that contains those provisions. That means you have to embrace their hypothetical, right? Yeah, I think in the event that happens, they would be liable, but the reality is it's never going to happen because the commercial realities involved with commercial real estate properties mean that a small, tiny little encumbrance is not going to prevent the property from being sold. Therefore, paragraph 7 of the policy would kick in and the lender would eventually be able to recoup its loan proceeds. The time when the lender is not going to be able to recoup its loan proceeds is when you have these rights and obligations that are at 1 through 4. That's when the lender is really going to lose out. And I cannot stress enough that this is what the title of the company is selling. They're selling the expertise to look through these documents, to find these rights and obligations, and to bring them to the attention of the lender. In reality, if one of these shows up, the lender is going to rip the documents apart. I don't understand them at this stage of litigation. Last time around, yeah, they were arguing about that. But this time around, I understand them to be saying, okay, expressly accepted, we'll go ahead and take what you Third Circuit people say, but that couldn't really mean that the mere existence of one of those four horsemen, as you put it, in the declaration has the effect of sweeping any kind of restriction and prompting coverage, because that would lead to the acceptance of risk that nobody contemplated when they went into it. And that's what the amici are arguing and upset about, too. Are we faced with a circumstance where it's true that, because this is a black swan event, no one's really looked at this before, but if we took it your way, we would be running right into the teeth of what everybody's understood about this before? No, I don't think so. I think the meaning is plain. For the first five years of this litigation, everybody agreed that instruments were covered. Now, we can argue about whether that's the mandate or law of the case, but the fact of the matter is, nationwide, commonwealth, where did everybody agree to that? It's in the documents. If you look through the documents, there are multiple instances where the reference refers to the fact that the Al-Tanan covers instruments. Multiple instances are cited in that case. The district court hasn't held that in its opinion dismissing the case. This court certainly held that during the last panel. I mean, they said, we hold that. Well, we hold that. Wasn't that specifically in the context of talking about whether something is expressly accepted and not in the context here? I mean, it seems to me you're in a difficult position to say this is law of the case because by making that argument, it put you back right into the question Judge Stormwater was asking you at the start, and that is, since you were the one who was speaking the first go-round about exclusions of coverage being provision by provision, it wasn't abundantly clear that everybody was saying instrument by instrument. Well, I think the prior panel understood my argument, Your Honor. They said, we instead adopt nationwide's construction of the policy and hold that Paragraph 1B2 of the Al-Tanan endorsement extends coverage to loss from instrument in either party's Schedule D. They understood my argument. They adopted it, and that was the whole thing. And what's more, it was clear that the prior panel was looking at what is covered. On January 14th of 2009, the prior panel sent out a letter asking for supplemental briefing, and in that letter they say, what is the industry practice for distinguishing between instruments brought into coverage by an Al-Tanan endorsement and those that remain accepted for coverage? The prior panel specifically asked this question. It was clearly before the prior panel. And in response, Commonwealth filed a supplemental brief, and the first item they cite is a quote from an article by Ed Urban, and what they quoted is Item 1B2. This covers any instrument in Schedule D that contains CCRs, Covenants, Conditions, and Restrictions. This is... What are you reading from? What are you reading from? I am reading from the supplemental brief filed in the last appeal by Commonwealth and entitled Page 2. Okay, thank you. Does that have a record before us? It is part of the Joint Public Session. You want us to affirm the district court, obviously. Yes, sir. And the district court held specifically that this was not law of the case, right? That is correct. So you want us to pull them partly, but not all the way? Okay, I think that would be true. Now, in terms of what the district court held was law of the case or was not, if you look back to the Bridge case, I have a cite for you. I can pull it out if you like. Whether something, whether an opinion held or did not hold something for purposes of law of the case is determined from the reasonable perspective of a litigant. The judge's interpretation is not binding. So I know what Judge Butler just said, but I think the issue is really how would it have appeared to Nationwide or Commonwealth. It doesn't matter whether it's law of the case if it's before us now, right? We have to decide it now. Well, I don't think the law of the case supports it. You're trying to tell us the game is already over, so we're all here for no purpose. I guess the question that that prompts in my mind is if it's true that this were law of the case, then I would have thought that a jurist as careful as Judge Bookwalter might not have been taken in by the argument that stopped.  The assertion that you're making about law of the case sort of requires us, does it not, to assume that all the discussion which was focused on expressly accepted or not and which, at least in Judge Bookwalter's and your opponent's view, was based on an assumption that would get to the question of expressly accepted now takes that assumption and makes it a decided fact? I would say, Your Honor, it was not an assumption. I would say that if you carefully parse the arguments that were made in the motion to dismiss and that were before the court in the prior appeal, the idea that an instrument is covered was integral to and inherent in the conclusion of how these items are expressly accepted. You can't say what's accepted unless you first understand what the coverage is. So in the motion to dismiss and before the prior panel, Nationwide argued that all instruments are covered if they're mentioned on Exhibit B. The contrary argument from my opponent was that instruments are covered if they're on Part 2 of Schedule B. Both of the parties assumed throughout all of the litigation that instruments were always covered. I guess that's the point. We say both parties assumed. It was integral to and inherent in their conclusion of how items have to be accepted. I want to thank the court and I hope they will affirm Judge Bookwalter. Do you have any questions? Do you have any more questions? Okay, thank you. If I may, I just want to... Can you tell us what you think is wrong, what was wrong in Judge Bookwalter's opinion? Focus in specifically on what you think was the error. The error was in focusing on the term instrument divorced from the balance of the endorsement provisions isolated from the coverage provided by the policy. But it certainly does say instrument. There's no question. And what is the purpose of the reference to any instrument in Paragraph 1B2 of the non-endorsement if it doesn't place the entire instrument back into coverage? What the endorsement says and the role the instrument plays is because typically on Schedule B, Part 1, exclusions from coverage, exceptions from coverage, you list instruments. And so the reference is to what needed to be listed on... is partially with regard to what's listed on Schedule B. Now, when Counsel for Nationhood talks about Commonwealth's initial position, we have never been of the opinion that the failure to execute 1B2 properly places the entire instrument back into coverage. The language that they quote from our earlier briefs is with regard to an entirely different question, which is, what had to be listed on Schedule B in order for the exclusion to include the 1B2 encumbrances? And Commonwealth's belief at the outset of this case, since repudiated by this Court, was that you focus on the instrument as to what needs to be listed on Schedule B. I noticed that the subparagraph we're talking about, 1B2, the other paragraphs in Paragraph 1 are listed differently. They just list the encumbrance. That's right. How do you explain that? These ones are different. And what is materially different is the reference to unless expressly accepted on Schedule B, the instrument here was expressly accepted. What this Court instructed Commonwealth was, it wasn't sufficient to exclude from coverage the 1B2 extraordinary encumbrances by simply excluding the instrument as a whole. But in order to apply 1B2, you cannot ignore the preparatory language which says, unless expressly accepted on Schedule B. And if I may, without belaboring the point, what this Court actually held, and you can look for this in the conclusion of the opinion, not in the interim statements that Judge Buckwalter found taken out of context, creating a deceptive appearance on the part of Nationwide, the Court ruled Commonwealth bore the burden of detecting the restrictions stated in the declaration, that is, the 1B2 restrictions, and had to list those restrictions explicitly in Schedule B as exceptions to avoid covering loss from then. Okay, so we assume for the sake of discussion that we're going to agree with you and Judge Buckwalter that it's not really the case. We're looking at this thing about scope of coverage. It's before us. So set that aside for the purpose of the last few minutes you've got here. And explain to us why the wording chosen by a sophisticated insurer should not bind that sophisticated insurer. The wording, not industry custom practice, not please don't put too much emphasis on instrument. I mean, the logical wording of the provision takes a class of things by deciding whether or not one of four provisions is in it and then says certain things flow from that on an instrument basis, not on a piece-by-piece basis, but on the basis of the full instrument. Why should we not say, hey, we're big boys. You know how to write stuff. In fact, in the immediately preceding provision you knew how to draft it so that that didn't happen, the 1A instead of the 1B. You live with what you drafted. Once again, I think that the basis for that premise is in the statement of the policy language. We believe that this is plain and clear. And again, the distinction is 1B specifically retains unless expressly excluded on Schedule B. The instrument, and this court determined that in addition to the instrument, which is excluded from coverage, we have to identify and list the extraordinary 1B2 encumbrances in order to include them in the exclusion from coverage. You have to put those. That's the last argument. That's nationwide last go-round. And that's true. That's what we rule. Now we're only asking the question, what does it mean when you use the words any instrument referred to in Schedule B containing covenants, et cetera, which in addition has these four things, means you get coverage. So here nationwide says Judge Buckwalter accepted it. We fit that. We fit that precisely by its terms. How do they not fit that precisely by their terms? Because the only way that you get coverage for the entire instrument is to ignore 1B, which states unless expressly accepted in Schedule B. What wasn't expressly accepted in Schedule B were only the extraordinary encumbrances. The instrument was expressly accepted in Schedule B-1. Keeping in mind that Schedule B isn't only excluded items, Schedule B-2 are other instruments containing covenants, conditions, or restrictions that prioritize the 1B. Doesn't that just kind of take away what we said the last time you were here? It's a very strange thing to hear you say, yes, we know we lost on what expressly accepted means, but now we want you to, when you're talking about scope of coverage, it's not law of the case, but go back and pay attention to what expressly accepted means again. As Judge Buckwalter correctly noted, they were talking about two different questions. This court initially determined what had to be listed in order to trigger 1B-2. Right, and if you didn't list those, then you didn't. And then that's the next question. If you didn't list them, what's placed back into coverage? That was not what this court reviewed before. Right, and if you didn't list them, and you move to the next step, what's placed back into coverage? The only thing not expressly accepted in Schedule B, which are any of the 1B-2 extraordinary encumbrances that you may have missed. Keep in mind, part of the absurdity of Nationwide's outcome is we go through an exhaustive document. We list 99 out of 100 of the 1B-2 categories of four different types of extraordinary encumbrances in this one. Sure, but their assertion is that that's a consequence of your drafting. If you didn't want to take that on, there was very simple ways to avoid it, and in fact, you did avoid just that kind of result in 1A. So it's not, you know, if you didn't want to take that risk on, you could draft around it simply, but you didn't draft around it. So if that's a bad result for you, that's a bad result for you. I can only reiterate what I've said, which is that that's a distortion of the endorsement language. I think that contrary to Nationwide's contention about Mr. Nielsen's report, as we say in our brief, Section 4, the report begins, the Alpha 9 endorsement provides several assurances concerning particular provisions of instruments accepted as regular policy. Is this the support you have for saying the custom is so clear? Is that what we want? I think the amici make it abundantly clear that 100% of the industry applies the same exact rules. What is the record that we can rely on? I mean, an amicus brief doesn't constitute evidence, does it? It supports Commonwealth's interpretation of the plain language supported by Mr. Nielsen's expert testimony on that topic. And notably, Nationwide's expert had no opinion on that topic to dispute or not. So the only evidence, as noted by Judge Buckwalter, is this. And the amici confirm Commonwealth's reading. That's the point that the amici support here. How do you respond to the assertion by your opposing counsel that Mr. Nielsen actually said things that support the contrary view, like from one portion that they said, paragraph, they quoted in the same paragraph, 1B2, indemnifies insured against loss. He suffers as to any such accepted CCNR declaration, which in addition includes one of the four specified encumbrances. And that refers to the specific 1B2 encumbrance, 1. But then doesn't he go on and say that a CCR declaration is a, quote, entire instrument? I think that the point as set forth in that reply brief, and as Judge Buckwalter noted, He does say that, right? I mean, out of context. It's applied in a different context. It doesn't answer this question. So you take those words and you put them in, and you create an answer to a question that wasn't asked, giving a misimpression of what he's saying. In the expert report, he specifically addressed this precise issue. We're not talking about a text on title insurance where the court is taken out of context and to give an inappropriate misimpression of his intent and meaning. Thank you. The red light is on. Thank you. We will take this difficult matter under advisement.